# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

FRANCES KONOPKA,                )
                                )
       Plaintiff,          )
                                )
  v.                            )   06 cv 6456
                                )   Magistrate Judge Susan E. Cox
JO ANNE BARNHART                )
                                )
       Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Frances Konopka ("plaintiff") moves this Court for a reversal or remand of the final decision of the Commissioner for Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405 (g). The parties have filed cross motions for summary judgment; the Commissioner is seeking an affirmance of the decision.[1] For the reasons stated below, we remand the decision of the ALJ for further findings.

### I. Procedural Background

On February 10, 2004, plaintiff filed an application for DIB stating that she had been disabled since January 25, 2002 as a result of neck and back pain. (R. 30-31, 77-79.)[2] The Social Security Administration ("SSA") initially denied her application for DIB on May 6, 2004 and, after plaintiff requested that SSA reconsider that denial, denied her application upon reconsideration on

---

[1] The parties have consented to the jurisdiction of this Court by agreement and pursuant to 28 U.S.C. § 636 (c).

[2] All references to the administrative record will be to "R."

February 11, 2005. (R. 24, 30-31.) After a timely request for a hearing, plaintiff appeared on September 29, 2007 without counsel before an administrative law judge ("ALJ") who heard from plaintiff, her fiancé, with whom she lives, and a vocational expert ("VE"). The ALJ denied plaintiff's claim for DIB in a written decision issued on October 31, 2005. (R. 24-29.) After the SSA Appeals Council rejected plaintiff's appeal of that decision, it became final on November 6, 2006. (R. 5-7.) Plaintiff filed this action on November 27, 2006, and the final briefs on the cross-motions were submitted to the Court in June of 2007.

## II. Facts Developed At the Hearing and In the Record

Plaintiff was born on July 31, 1960, making her 45 years old at the time of the hearing. (R. 27.) Accordingly, she falls within the "younger" (45-49) category under the Act. She is single, but engaged to her fiancé, Frederick Tucker, with whom she lives. (R. 229-33.) She attended high school, but did not graduate. (R. 217.) She has maintained various positions during her working life, including maintenance worker, assistant manager in a general store and cashier. (R. 115-121, 233-235.)

During the 1990s, plaintiff was in an automobile accident. She testified at the hearing (and reported to Dr. Biale, who evaluated plaintiff during the course of SSA's evaluation of her claim) that this accident had caused an injury to the disks in her neck. At the time of this accident, plaintiff had an MRI taken of her neck at Ravenswood Hospital and was informed that this MRI showed that she had two herniated disks and one bulging disk. (R. 105, 218-219.) Records of this treatment were not produced at the hearing and plaintiff testified that she thought they had been destroyed as a result of the passage of time. (R. 219.) On January 25, 2002, plaintiff again was injured in a second automobile accident. (R. 158, 162, 217.) She was treated on an emergency basis at St. Francis

Hospital where she was diagnosed as having "acute muscle strain." (R. 153-157.) An x-ray was taken of her cervical spine and that x-ray revealed mild degenerative disk disease and disk space narrowing at certain points. (R. 157.) She received physical therapy after this accident, but no records of this were obtained for the hearing. After this accident, she was fired from her job as a cashier because she was unable to hold things, including money. (R. 217.) She also experienced chronic pain for which she self-medicated, taking Ibuprofen frequently, which she continued taking until at least the time of the hearing. (R. 110, 124, 159, 163, 241.)

The plaintiff has no regular physician, but instead, receives emergent care when her pain is severe. According to plaintiff, after her physician informed her during the 1990's that she could either have surgery, which could affect her ability to walk, or manage the pain, she elected to try to manage the pain herself. There were no other options presented to her. (R. 105.) In addition to the two consultative examinations which were done in connection with plaintiff's claim for DIB, plaintiff was hospitalized at least two additional times. In 2003, she was treated at St. Francis Hospital for chest pain which radiated to her back, and for shortness of breath. She was examined and released with a diagnosis of acute chest pain and hypertension. It should be noted that she left the hospital against the advice of her treating physician. (R. 140-149.)

The second subsequent hospitalization occurred in May 2005. She complained that she had been experiencing dizziness for some time which caused her to have headaches. She also stated to the physicians who treated her, that her left hip had been giving out. (R. 197.) She had fallen and complained that her shoulder hurt, but an x-ray of the shoulder was negative for a fracture or dislocation. A computed tomography scan ("CAT scan") of her brain showed an abnormality described as a "thickening of the wall of the nasopharynx with a recommendation that her eyes, ears

and throat be evaluated to rule out neoplasm." (R. 190-203.) No neurological abnormalities were diagnosed. Plaintiff followed up with a visit to the Howard clinic, but was told nothing further could be done for her. (R. 220.)

During the course of the hearing on her claim, the results of two different consultative examinations were introduced into evidence. In April 2004, Michael Raymond, M.D. examined plaintiff at the request of the SSA. She reported her chief complaint to him was chronic and increasing pain in her spine for which she had no diagnostic or medical evaluations since 2002. The pain was focused in her upper back and neck and plaintiff reported that it prevented her from sitting or standing for greater than 45 minutes. Dr. Raymond reported that plaintiff had limited range of motion in flexion, extension and bending was limited to 15 degrees. He also noted that her hand grip was unimpaired. (R. 158-161.)

In September of 2004, another examination was performed, this time by Peter Biale, M.D. He contradicted Dr. Raymond's report in several respects. Dr. Biale reported that due to her neck pain, plaintiff had a hard time getting on and off the examining table, something Dr. Raymond said she had done easily. (R. 165.) He also reported that plaintiff's left hand grip was quite impaired, that the Romberg test was positive (Dr. Raymond had reported it as negative), and that there was serious muscular atrophy in the left hand. Dr. Biale also stated that plaintiff had severe range of motion of her cervical spine. An x-ray taken showed "some minimal intervertebral disc space narrowing at C4-5." (R. 162-167.)

At the hearing, plaintiff testified extensively about her symptoms, stating that her pain worsened considerably after her second automobile accident. (R. 216-217.) She reported dizziness which occurred three times a day to three times a week and caused her to fall. (R. 219-220.) Despite

plaintiff's medical problems, she does not see a doctor regularly. According to plaintiff, she lacks financial resources and health insurance, and did not like the treatment options previously presented to her: risky surgery, or, as an alternative, over-dependence on pain medications. (R. 218-219, 227-228.) She cannot turn her neck properly and is unable to drive except in the most limited fashion. She cannot use her left hand properly and has to be helped by her fiancé to carry things and to help her dress. She cannot stand or sit for more than a half hour without severe pain and cannot look down to read without pain for more than ten to thirty minutes. (R. 220-240.) Her fiancé corroborated this testimony. (R. 225-227.)

The final witness at the hearing was James Radke, a vocational expert. He described the plaintiff's past jobs as: (1) cashier at the medium/unskilled semi-skilled level; (2) assistant manager at the medium-skilled level; and (3) the maintenance/delivery at the light/semi-skilled levels. (R. 233-36.) The ALJ asked the VE to answer a hypothetical question based upon the plaintiff's age, education, and vocational background. In the hypothetical, the ALJ asked the VE whether an individual with the same vocational characteristics as the plaintiff could perform day work in the economy assuming that she was limited to lifting twenty pounds occasionally and ten pounds frequently with the right arm; had no effective use of the left arm; was restricted to sitting, standing, or walking for six hours with a stand/sit option; could not look up or twist her neck, and, could not reach above the head with either arm. (R. 237-239.) The VE stated that plaintiff could no longer work in the jobs she had previously held with those restrictions. Nevertheless, she could retain the ability to perform a significant range of light work in the economy, including 2,600 receptionist positions; 5200 messenger positions; and 4,000 customer service representative positions. (R. 238-239.) In addition, he identified a significant number of sedentary positions plaintiff could perform

including 2,300 payroll clerk positions; 3,500 receptionists, 2000 customer service positions and 6,300 billing clerk positions. The ALJ asked the VE if his answer would change if the person had to take frequent, unscheduled breaks due to pain. In response, the VE stated that this person could not be employed in a regular employer-employee relationship, but would have to work as an independent contractor. (R. 240.) Finally, the VE stated that the hypothetical person could not use a computer because she could only use one hand and that he did not consider an inability to gaze downward in his analysis. (R. 240.)

### III. The October 31, 2005 Decision of the ALJ

In his decision dated October 31, 2005, the ALJ ruled that plaintiff was not disabled and, accordingly, was not entitled to DIB. The ALJ utilized the five-step sequential evaluation pursuant to 20 C.F.R. § 404.1520. (R. 25-29.) At step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since January 25, 2002. At step two, the ALJ found that plaintiff's condition produced limitations which significantly limit (has more than a limited effect) on her ability to perform basic work activities. However, at step three, the ALJ found that the record did not establish that she was subject to any impairment or combination of impairments that meet or medically equal the specifications of an impairment listed in the SSA regulations. In making this decision, the ALJ found that the medical evidence in the record did not support a finding that she had experienced neurological abnormalities such as motor-loss, sensory-loss, or muscle weakness which would be required to meet the requirements of section 1.04 of the Listing Governing Vertebrogenic Disorders. He further found that there was no evidence of nerve root compression, a requirement within that section of the 1.04 Listing.

Having concluded that plaintiff's impairments were not medically equivalent to any of the

Listings, the ALJ moved on to step four. At this step, the ALJ determined the plaintiff's residual functional capacity ("RFC"). The RFC is what the claimant can still do in spite of her limitations. 20 C.F.R. § 404.1545. The ALJ found that the record established that the claimant's allegations of disabling impairments preclude the following work-related activities: lifting more than twenty pounds occasionally or more than ten pounds frequently; standing and/or walking for more than a total of six hours in an eight hour workday with the option to sit at will; sitting for more than a total of six hours in an eight hour workday with the option to stand at will; using her left arm; and performing work that requires looking up, twisting the neck or reaching overhead. (R. 25.)

However, the ALJ found that the record before him did not provide a basis for finding medically determinable impairments beyond this. (R. 26.) The evidence on which he relied to make this finding was: (1) the x-ray from January 25, 2002 which demonstrated only evidence of "degenerative disk disease," but no abnormal alignment of the spine; (2) the June 18, 2002 hospital report which concluded she was neurologically intact; (3) the April 19, 2004 consultative report, and, (4) Dr. Biale's September 10, 2004 report. (R. 26.) He further found the claimant's subjective allegations of pain and restrictions "lack credibility" based on the whole of the medical evidence.

Both during the course of the hearing, and again in his decision, the ALJ noted that the failure of the claimant to pursue and continue ongoing treatment was a factor in his decision: "I would expect someone with severe, intractable pain to more aggressively seek treatment." (R. 27.)

Once having adopted the RFC set forth above, the next step is to determine whether the claimant is capable of performing any "past relevant work." The VE testified that she could not resume working in her previous capacities (most recently as a cashier). Thus, the fifth and final step is for the Commissioner to show that there are jobs existing in significant numbers in the economy

which the claimant can perform that is consistent with her age, education, work experience, and residual functional capacity. The ALJ adopted the testimony of the VE that the plaintiff could still perform the following available jobs in the economy: receptionists, messengers, customer service representatives and billing clerks. (R. 28)

## IV. Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir.1990); *see also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (*quoting Richardson v. Perales,* 403 U.S. 389, 401 (1971)).

This does not mean that the Commissioner (or the ALJ) is entitled to unlimited judicial deference, however. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993). When the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984) (*quoting Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981) and holding that such explanation is "absolutely essential for

meaningful appellate review").

Further, although the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski,* 732 F.2d at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78 (*quoting Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 472, 477-78 (1951)) (where substantial evidence in favor of the agency's decision cannot be determined in isolation from the aggregate record).

## V. Analysis

The plaintiff makes various arguments in favor of a reversal or remand. First, she argues that the ALJ failed to adequately develop the record and medical evidence with respect to her claim given her status as an unrepresented party. Second, plaintiff contends that the ALJ erred in his finding that the evidence in the record did not support a finding that plaintiff met the criteria listed in Listing 1.04A, which, as noted below, these two issues are related. Third, plaintiff contends that the ALJ erred in determining the plaintiff's RFC because he failed to consider the evidence that she could not work without frequent breaks; did not assess her impairments function by function; ignored evidence in the record concerning her dizziness and ascribed a negative inference from her failure to seek out more sustained medical treatment despite the fact that she testified that she was financially unable to do so. Finally, the plaintiff claims that the ALJ's Step 5 analysis is deeply flawed because it relied upon evidence given by a VE who did not include all of plaintiff's impairments in his testimony concerning the jobs a hypothetical similarly situated person could perform. Because we conclude

that the ALJ both failed to develop the record adequately at Step 3, and did not articulate why he found that plaintiff did not meet the Listing (and therefore was not *per se* disabled), we remand for further findings and need not reach the errors alleged by plaintiff at Step 4 or Step 5.

Plaintiff was not represented at the hearing and knowingly waived her right to counsel, stating that she could not obtain counsel. (R. 211-212.) She stated that she could not obtain counsel because no lawyer was willing to represent someone not under a current physician's care. (R. 213.) At the close of the evidence in the case, the ALJ stated that plaintiff's case was extremely close and her ability to prove her allegations was hindered by the fact that the records in the case were incomplete, especially those records about which plaintiff testified and were referenced in other medical evidence that she had bulging and herniated spinal disks. (R. 248.) In addition to these missing records, there were existing records known to the ALJ concerning physical therapy which plaintiff received after her second car accident, and records regarding follow-up treatment for dizziness from the Howard Clinic.

The ALJ relied upon more recent records to find that plaintiff had failed to prove that she was not impaired, including x-rays taken in 2002, after her accident, and a subsequent x-ray reviewed by Dr. Biale in 2004 which showed mild degenerative disk disease and narrowing of the disks. None of the records introduced at the hearing discussed whether plaintiff had experienced (or was experiencing) nerve root compression. In fact, the record is completely silent on this issue.

The Seventh Circuit has held that an ALJ has a heightened duty to ensure that the record is fully developed when a claimant is unrepresented, although the extent to which such evidence must be gathered is generally left to the ALJ. *Thompson v. Sullivan,* 933 F.2d 581, 587 (7th Cir. 1991). Moreover, we must find that there is a significant omission from the record to rule that an ALJ failed

in his duty. *Thompson,* 933 F.2d at 586-587. In addition, the regulations clearly give an ALJ the ability to order further tests and examinations when the records before him do not present enough information to make an informed disability decision. *See* 20 C.F.R. § 404.1517, 404.1519k.

In this case, the Court is left with the clear impression that the ALJ himself questioned whether the record had been fully developed, and was disturbed by inconsistencies between the two consultative reports as to the extent of plaintiff's impairments. On the latter point, the ALJ noted a clear and troubling discrepancy between the reports of Dr. Raymond and Dr. Biale concerning plaintiff's left arm, which the former described as essentially unimpaired, and Dr. Biale described as badly dysfunctional. (R. 242.) Further, as we have noted above, the examinations produced different findings on the extent of plaintiff's mobility as well. Both examination reports, which were months apart, were relied upon by the ALJ without any attempt to reconcile the significant differences in their results. (R. 25-29.) Further, the ALJ cited both of these reports to support his conclusion that plaintiff failed to show motor-loss, sensory-loss, or muscle weakness, without explaining how or why he reached this conclusion. (*Id.)* Dr. Biale's report documented, for example, motor-loss (difficulty getting on and off the examining table), sensory-loss in the left upper extremity and muscle weakness (significant atrophy in the left hand). R.160-165.

More problematic, however, is the fact that the ALJ relied upon the existing medical evidence to rule out "nerve root compression," but there is no such finding by any physician. This is important, of course, because this is the chief reason why plaintiff failed to fulfill requirements of the Listing for her impairment at Step 3. The ALJ failed to explain how an x-ray in 2004, which showed some degeneration of disks, ruled out nerve root compression. It should be noted on this point that plaintiff's last MRI, a much more comprehensive diagnostic tool than an x-ray, had been taken

several years earlier. The plaintiff did not have this record at the hearing and believed it was unavailable. Whether the records were really unavailable for the hearing is unknown because the ALJ did not request them; he relied upon the plaintiff's statement that she herself could not obtain them.( R. 228-229.) Subsequent treaters, however, reported that plaintiff had told them (prior to the filing of this claim) that this test had demonstrated that she had both herniated and bulging disks. In light of this fact, the discrepant consultative examinations, and the absence of any correlation between x-rays and nerve root compression, it is difficult to understand why the ALJ did not request further and more comprehensive diagnostic evidence on this issue.

It is especially hard to understand why further documentation was not sought when the Court considers that the ALJ himself commented that this case was "extremely close" and the fact that plaintiff did not have a treating doctor was "a real problem." He further stated that the records of her impairment were "extremely poor." (R. 248.) He then specifically acknowledged that only an MRI could determine whether the extent of plaintiff's degenerative disk problem. (R. 249.) But he did not act to obtain one which was, under circumstances presented here, a significant omission from the record.

Plaintiff was required to prove that she met the listing of impairments for adults with spinal disorders. *See* 20 C.F.R. Pt. 404, SubPt. P, App. I, Section 104. We find that the ALJ failed to even minimally articulate how, in light of the conflicting medical evidence, the record did not establish that she had motor and sensory loss and muscle loss weakness–all of which is at least suggested in the medical records. In addition to the medical evidence, which corroborated the likelihood of these impairments, plaintiff's testimony and that of her fiancé also corroborated that they existed. The ALJ inappropriately discounted this testimony because it was not corroborated by medical evidence,

evidence which he himself recognized was, at least in part, due to plaintiff's lack of a treating physician. Further, we not only find that the ALJ did not obtain all of plaintiff's existing medical records, which may shed light on some of these issues, but that there is nothing set out in the existing record which addresses the critical question of whether plaintiff has experienced nerve root compression. The ALJ did not articulate how he reached the conclusion that plaintiff did not have nerve root compression, despite the fact that he acknowledged that the extent of her degenerative disk disease could not be ascertained without an MRI, which he did not obtain. Thus he failed in his duty to order additional medical examinations and tests when that medical evidence was necessary to make an informed disability decision. *See Green v. Apfel*, 204 F.3d 780, 781-82 (7th Cir. 2000); *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000); *Steele v. Barnhart*, 290 F.3d 936, 940-41 (7th Cir. 2002), 20 C.F.R. 404.1517, 404.1519k. Accordingly, we remand this case back to the ALJ for the purpose of ordering such diagnostic testing and to further articulate how existing medical evidence (and any further evidence developed) meets or does not meet the Listing, as required in Step 3.

**IT IS SO ORDERED.**

U.S. Magistrate Judge
Susan E. Cox

Date: <u>January 14, 2008</u>